Oral argument not to exceed 15 minutes per side. Mr. Torsha for the appellant. Good morning. Good morning, Your Honor. I would like to reserve three minutes for rebuttal. Very well. May it please the Court, my name is Dave Torchier, and I am here on behalf of the appellant, Pam Hale. I know the Court is familiar with the facts, and I don't want to go through them, but the Court also knows that this case comes to the Court on a decision granting summary judgment on plaintiffs' claims for AIDS discrimination and wrongful termination in violation of the public policy of Ohio. I want to focus this morning on the AIDS discrimination claim because the Court is very much focused on pretext and whether or not there was sufficient evidence of pretext to send this case to a jury. As the Court is aware, Ms. Hale was a pharmacy buyer for the Mercy Health System, working primarily at the Anderson Hospital. I don't know if any of you are familiar. The hospitals are separated by about 10 miles. Ms. Hale was mostly at Anderson. There was another number or so years that Ms. Hale worked at Mercy. She was mostly at Claremont. At the time of her, I'm sorry, mostly at Anderson. At the time of her dismissal, she had never been disciplined before. She had a good record. She had a history of positive evaluations. Her supervisor testified that there was never any evidence or hint of any sort of dishonest conduct on her part. Well, they could fire her, I suppose, for any reason as long as it's not AIDS discrimination or one of the other rights that she would have. Correct, Your Honor. Though, I mean, if they didn't like her, they could fire her unless it had to do with AIDS discrimination. We're dealing in this case with exceptions to the Employment at Will Doctrine, which is AIDS discrimination and the public policy claim is also an exception. Keep your voice up. I'm sorry. The public policy claim is also an exception to the Employment at Will Doctrine. But on June 14th, Ms. Hale was called into a meeting without any prior notice, no hint of what it was about. Does she have a right to have prior notice? I mean, if she's an at-will employee, I mean, she can be terminated at any time, can't she? That's correct, Judge. So, I mean, is there, I mean, there is no right to a prior notice or to a contested hearing, a grievance, or, you know, like a union contract that we often see, right? That's correct. I mean, you spent a lot of time saying, well, the procedure was unfair. Well, that's not the issue, though, is it? Well, Judge, the reason I bring up the fact that she didn't have any previous notice was that the bulk of, at least from my perspective, the bulk of the district court's opinion on the pretext issue was focused on the honest belief doctrine. And there are cases that say when a decision is made to terminate somebody before they're even talked to, that undermines the honest belief defense or can undermine the honest belief defense. It doesn't establish a per se rule. It might be evidence of it. Correct. Correct, Judge. It goes to show, ultimately, the honest belief defense says that at the time the decision was made, the employer made a reasoned and informed decision. Well, here, they did an audit of her time sheets or time records or whatever it was, and then they talked to her supervisor, right? They talked to her supervisor. Then they prepared the discharge. They had it all set up before they met with her, and then they had a very abbreviated meeting with her, and they confronted her, and she didn't have an explanation, and then the termination was effective, right? Judge, there's a dispute about that. From Ms. Hale's testimony and from the record, an inference can certainly be drawn that the decision to terminate her was made before they even met with her supervisor. The evidence was that on June 14th at around 1 o'clock, 1.30 in the afternoon, they met with her supervisor, Mr. Carroll. They asked him some questions. He clarified that at some points Ms. Hale may have had to work off-site or could put in extra hours. Management also told Mr. Carroll at that time to proceed as if we were going with Plan B. In other words, don't prepare a schedule without Ms. Hale on it. They then immediately went to the meeting with Ms. Hale, and the first thing that happened, according to Ms. Hale, and this is disputed, but for summary judgment, Ms. Hale's testimony is to be credited. The first thing that happened, according to Ms. Hale, is they gave her the termination form, and then they asked her questions. So we have evidence in this case that the decision to terminate Ms. Hale was made before they... Was the termination form effective at that time? I don't know if it needs to be signed or it's got to be approved. I mean, it was prepared, and they gave it to her, but was there anything to do, anything more to make it effective at that point, or was it effective? Judge, the testimony from Ms. Hale was they said... Well, I know that. Here's the form. I mean, does it have to be signed by somebody in the company? Does it have to be dated? Does it have to be... It was eventually signed at the end of the meeting. Okay, so it wasn't effective because it wasn't signed. Well, except that, Judge, according to Ms. Hale, the first thing that was said to her was you were being terminated. Here is the form. You were being terminated. So, at least from our perspective, the decision was made. Ms. Hale was notified and told that she was being terminated at that point in time. That's not illegal. That can be done legally, right? It can be done, Your Honor, but it raises serious questions about the honest belief defense, especially in a case like this where the employer is getting into the employee's motive. The employer is saying, basically, you falsified your time sheets to steal time. That's what the essence of the allegation is. In the Shazer case, which this court decided in February of 2014, the court refused to apply the honest belief defense. In that case, the employee had been accused of lying. The company, the decision maker, asked one employee, who was actually the general counsel for the company, what happened. General counsel told him what happened. The employee, Shazer, was fired based on that one conversation. The panel in the Shazer court held that when you are going to get into somebody's motive, whether they intentionally did something wrong, intentionally lied, one conversation is not sufficient. In fact, what the court said was, in the Shazer case, one conversation did not establish sufficient particularized facts about the truth behind plaintiff's statements, let alone her motive. I think what the Shazer case is saying is, if an employer is going to say that they had an honest belief, and that honest belief is that the employee intentionally lied, intentionally falsified documents, you can't just go on one conversation. Here, as I said, there's evidence that the decision was made before the conversation with Ms. Hale even took place. But they could go on after the hearing that she had, if, in fact, she corroborated whatever the suspicions were, right? I mean, if she said, well, yeah, I did this, that would be enough, right? If she admitted it, yes, Judge, but she didn't admit anything. In fact, did they give her a chance to admit or deny what had happened? They asked her, according to Ms. Hale, they asked her about a few entries. And Ms. Hale said, I'd like to go get my calendar or some documents to at least be able to respond to your questions. You have to remember, Judge, that this was a 23-page document. It had lines for every single day of the month for the previous two months. Well, I mean, a reasonable person is accused of falsifying documents. Would you not expect the response to be, no, I did not falsify any documents, as opposed to, I'll get back to you later after I look at my calendar? I mean, what would you expect a reasonable person to respond to an allegation that we are terminating you because you falsified documents? And the response is, I'll get back to you after I look at my calendar. I mean, would you not expect a person who is accused of such an act to say, no, I didn't falsify anything, all those records are honestly made? If that's, Judge, there's no testimony that that's the way the hearing went. According to Ms. Hale. Well, you just told me that her response was, I'll get back to you. Because they asked about three or four particular dates in question. Okay, they also gave her the form, you said, you're terminator are going to be terminated because of falsification, right? Right. So she knew what the charges were. Correct. And, I mean, wouldn't you expect a reasonable person to say, no, I didn't falsify anything? Judge, I would expect a reasonable person, it's possible somebody could respond that way. I would just expect it. She was asked about particular dates, right? Correct. And her response was, well, can I get my calendar so I can answer your question? Her response was, please let me go and review my calendar or notes so that I can help you. Again, these dates go back 60 days. And asking somebody. Well, depending on my calendar, I may or may not have falsified it. I'll have to check my calendar to see if I did falsify it. I mean, that leaves an area of doubt there, depending on what my calendar shows. Yeah, it may be true I falsified it, but I'll check the calendar. Judge, Ms. Hale wanted to give accurate information. That's why she wanted to check. Well, I mean, if the accurate information is, yes, I did. She never admitted that she did anything wrong. She wanted some additional information. She didn't deny it. That's the other problem. She wasn't asked specifically about whether this particular date was a falsification or not. And, Judge, we've cited cases in our brief that are not from this circuit or this district where courts have looked at similar situations and have said when an employer does this to an employee and they don't allow the employee time to go check or get information or check some records, that can be some indicia of discrimination. And I'd ask the court to compare this case to what happened in Seeger v. Cincinnati Bell, which is a case that shows it's an honest belief case. In that case, Seeger was accused of fraudulently claiming short-term disability benefits. He was seen at a festival. The company called him in. They asked him questions. They suspended him. They said, come back. Come back. Give us any information you can to explain why you did what you did. They gave him the opportunity to explain. A week later, after they had the opportunity and after the company continued to investigate, they let him go. But at least he had the opportunity to fully explain what happened. Did your client now say that she did not alter the records at all? Yes, Your Honor. When she had the chance to get the audit and review the dates and compare it with her calendar, she was able to explain the three or four dates where they said she added time. But she did, didn't she? But everybody did. Everybody. Wasn't everybody doing the same thing that she did? Everybody in the department was doing things similar to that. They were entering their time manually. Everybody's altering the records? Is that what you're saying? Altering, changing, falsifying, no. Everybody. One employee, one younger employee, the comparator, Abigail Muchmore, did the exact same thing. Did the employer know that the other employers were altering the records at the time of your client's termination? They didn't know. Okay, how can you look at the comparables if they didn't know? Well, because Ms. Muchmore was the buyer. This whole thing started because there was a shortage of inventory at the Claremont Hospital. That's where Abigail Muchmore, the 30-year-old buyer, was employed. And when the inventory shortage showed up, Heintzelman, the CEO, says, I want an audit of plaintiff's records. Not Muchmore. Muchmore is the buyer at that hospital. So there's disparate treatment right there. Muchmore should have been the one who had her time records audited, or they both should have. And if they did, they would have found that Muchmore was doing the same thing as plaintiff. All right. I think you reserved three minutes for rebuttal. You'll still have your three minutes for rebuttal. Good morning. Good morning, Your Honors, and may it please the Court, Tom Wencek for Mercy Health. There are three issues here. The age, race, and public policy issues. We don't have race anymore, do we? Yeah, I thought the race was not appeal. Okay. Then we have age and public policy. And Mercy terminated Ms. Hale for altering her time card, which is against our work rule. In regard to the age case, the district court below met this court's Hanzer elements, all three of the Hanzer elements, because it found first that there was a basis in fact, and a limited sampling. There were numerous alterations made to the time cards. Hale admitted that what she did was unethical and inappropriate. When did she admit that? She admitted that in one of the investigations when actually she had an appeal process where she made an appeal to a third-party neutral panel that we had, and she admitted Was it an internal grievance? Yes, it was an internal grievance procedure, which I think is important, because she's now, to the extent that she's arguing that she didn't have an adequate due process which creates an inference of some bum's rush, that the real motive was discrimination. I mean, she has no due process rights. Well, she had They're using this evidence to establish that the investigation was not reasonable. That's the purpose, I think. That's correct. But they're trying to establish inferences that we made a rash judgment, and therefore But the grievance is post-termination, right? That's correct. So you can't rely on her process and grievance to establish that the investigation prior to the termination was reasonable because it happened afterwards. Well, the whole appeal process is to make sure that the prior process was done appropriately. For example, if she wasn't allowed to bring her calendar, and that was prejudicial somehow, she then had an opportunity during the appeal process to bring that calendar, which she didn't do. And she lost the grievance process, right? That's correct. The grievance process found that this was justified. Does that have any raised judicata effect on this case? It doesn't, but it certainly supports the fact that a neutral panel that was not part of our hospital, her own peers, when they heard her having a full opportunity, this was not a truncated opportunity, a full opportunity to tell her story where she never claimed any discrimination whatsoever, never brought her calendar. When they had the full opportunity, they validated the initial reasonable suspicion that we had that we made our initial decision. Wasn't everybody doing this? No, they weren't. No, they weren't. There were some exceptions. Much more right in Branham were three people that Hale brought forth, but we were unaware that they were doing any of this. When they did it, did you fire them the same way you fired her? Right, indeed, was terminated, and much more in Branham were not terminated because the nature and degree, and what was important to the court, was the systematic nature of how she did it. She would come weeks afterwards and then add her lunchtime and add things, and every single entry that she did, Your Honor, benefited her financially. So there was a distinct, as the court found under the Hanser elements, where there was a business reason did motivate, what she had to prove is that there were comparables, and she offered much more right in Branham, and they were not, the court found correctly that they were not proper comparables because we were not aware that they were doing it. When we were aware of right, it was in nature and degree that he was ultimately terminated, and with Branham and much more, there was just a difference in nature and degree. What, they just did it, they just... There were valid reasons to do it, whether or not they actually didn't take their lunch period, or they were called off site at a seminar training, there were valid... Are you saying that you established that her records were inaccurate? That she had not worked through lunch and she had not been called off? She couldn't validate it. She couldn't even validate it when I put her calendar in front of her during the deposition and I asked her the very dates that she said that would sustain it, she couldn't even validate it in her deposition. And the others validated everything? Yes, that's correct. So, in regard to the H case, the basis in fact was found by the court, the business reason motivated the termination was found to be appropriate, and then Mercy was actually motivated by the business reason where the court addressed what Judge Griffin addressed. Why did they do this investigation of her and not of anybody else? What prompted this investigation? The investigation was the lead pharmacist, Ed Anderson, said that there was a shortage of some drugs in the pharmacy and she was responsible for keeping the inventory up. So he wanted to contact her to see why there was a shortage and we couldn't find her. So he contacted her supervisor, her supervisor couldn't find her, so ultimately once that was taken care of, she was splitting her time between hospitals, so there was a question as to whether or not she was doing her job appropriately. So they wanted to see where she was and that led to an audit of time to make sure that she was splitting her time appropriately and fulfilling her requirements. And that showed a bunch of inconsistencies that raised some questions. And how soon after that investigation did this happen? The investigation... The audit? Yeah. The call, the phone call that she received asking about the drug. Very shortly thereafter, within days. As soon as they got the audit, that's what they did. So they got notified that there was a shortage, she wasn't around to answer the questions, and I would say within a week to two weeks they tried to investigate as to why she wasn't there and what the problem was. But why would they ask her and not much more about the missing drugs? Well, she was in charge of it. That was her primary responsibility. She was in charge of inventory. That was her job. So with the inventory shortage, we go to the person who's in charge of the inventory shortage. We can't find her. Why can't we find her? Then we do an audit, and then this audit indicates all these systematic inconsistencies, and then we confront her. She doesn't give us any adequate explanation, so we terminate her because it's indisputably a violation. Did you ever follow up with the drug audit? Excuse me? Did you ever follow up with the inventory issue? The drugs were fine. I mean, actually, well, the drugs were. It wasn't anybody stealing drugs. They just hadn't been replaced. So we did follow up on that, sure. So there's no dispute that there was a shortage of drugs. Yes, yes. It was her responsibility. That's right. There's no dispute that they tried to find her, and they couldn't find her. That's right. And therefore, they audited her time records to find out where the heck she was. Exactly. Okay, and that sounds like a business judgment, honest belief, and that part of it there's really no dispute, is there? There is no dispute about that. Okay, so then they did the audit of the time records. They found the alterations, I guess we'll call them, and there's no dispute that there are alterations. She admits that, right? That's correct. Though she claims that they're legitimate alterations. And then they talk to the supervisor, and then they do this form termination. Okay, question is, the termination form, is it not effective until it's signed, or was she effectively terminated before they met with her? No, she wasn't effectively terminated before. It is not effective until they make the final decision. All they did is they saw the reasonable grounds that there could be a termination, and they testified that they talked to each other and said, look, we're going to see what she says about this. If she doesn't provide an adequate explanation, then we're going to go ahead with the termination. If she does, then we're just going to have to suspend this process and see what's going on. So why wouldn't, it just seems normal to me that if you're in a room with somebody and you're saying, look, you falsified your record here these days, why wouldn't you let her get her calendar for her to see where she was working those days? Our position is she never asked to go see her calendar. But she says she did, so you have to accept that as true. So let's assume she did. We had numerous, from our position, she put her head down and she said she just couldn't give us an explanation. But that's not her testimony. You have to accept her testimony. Her testimony was that she wanted to offer her calendar, which Judge Griffin pointed out she never really denied ever, not falsifying anything or not altering anything. She was just insisting on her calendar. Okay, I mean, obviously we look at that particular fact differently. If somebody said to me, you have altered your record impermissibly, okay, I mean, there is some potential altering of records as you acknowledge because you said these other people legitimately did it. So you're telling her you've impermissibly altered your records. We're accusing you of lying about where you were on this day, this day, and this day. My response would be, perhaps I'm admitting something, my response would be, well, can I get my calendar, please, so I can tell you where I was those days? I would respond to the merits rather than saying, oh, no, no, no, no. I would see what they're accusing me of and say, let me get my calendar so I can tell you where I was. And I think the Sixth Circuit has said that it doesn't have to be a perfect disciplinary hearing, and once again, I want to underscore Judge White. There was a neutral appeal process that could clean up anything that she felt that she was denying. But you have a situation where that's true, but now we're looking at you got summary judgment on the honest belief. That's correct. Okay, and we're assessing that, and she has presented facts that make it look like you decided that you were firing her no matter what as soon as you got some information about her logs or her time logs, without permitting her to give an explanation. See, I disagree with that. If we were going to fire her no matter what, we wouldn't even have had the meeting. This whole case is Hale's attempt to shoehorn her facts into the Archer case, where, in fact, the employer did fire the employee, shot first then aim, did fire the employee without looking at conflicting evidence. We didn't have conflicting evidence here. We knew that there was alterations. And any improprieties in the actual investigation would have been cleaned up in the appellate process anyway. That's what I think is key. She had an opportunity, and then she had a further opportunity to defend herself in her deposition to explain her calendar, and it became irrelevant. The dates that were on her calendar didn't coincide, and she couldn't even explain it then. So I understand where that is, but I think the Sixth Circuit says that you don't have to overturn every – I think it's a Tibbs case that you don't have to look under every stone, and it doesn't have to be perfect. Well, the bottom line is it's her burden to establish that she was fired because of her age. That's correct. I mean, this is an age – I haven't heard anything about age so far. Nothing. Does your company have a history of discriminating against people because of their age? No. There's no direct evidence of any – There's no direct evidence. There's no subtle statements that they are prejudiced against older people? Nothing. What was her age, by the way? She wasn't very old. She was over 40. Okay, but 42 or something? She was not terribly old, but she was over 40. She was in the protected category. Okay, but she's not a real old person. No, she's not. She is replaced by a younger person, so there's some sort of an inference of – We conceded a prima facie case existed. The only issue was pretext, Your Honor. The bottom line is, I mean, you can have a circumstantial evidence to get to the jury, but the final thing is, is she subject to discrimination based upon her age? And she never alleged that in the grievance process? That's correct. Never alleged that in the grievance process. All right. Any further questions? I have another minute if you want to hear about the public policy exception. Tell us about that. I think the court was correct in dismissing the public policy because it's called a Greeley claim, Your Honor. It needs several elements, and the clarity element and the jeopardy elements are two elements that the court can decide. Here, she is suing under a pharmacy regulation that's just a baseline regulation that doesn't prohibit any kind of discrimination or retaliation, and she was never pressured to break the law or never fired for doing so. So there was never any activity that we did that even violated, even if it was the kind of public policy that provided for wrongful discharge. And there was never any jeopardy element here because she never informed the DEA or Mercy about any illegal activity. So there's no object lesson here that because she was fired, everybody knew she was fired for reporting anything. So there was no object lesson here that would offend society and the public policy. She wasn't a whistleblower. She wasn't a whistleblower. In fact, the whistleblower statute is something that she never took advantage of, and the General Assembly has promulgated the whistleblower statute to do that. Now, that doesn't preempt the field of whistleblowing, but where you have alternate statutes. If you're going to rely on an alternate statute, you should be relying on something like OSHA or FLSA or workers' compensation where the statutes specifically have those kinds of prohibition. Jaywalking is prohibited, but you wouldn't be able to use that as a public policy for being terminated for being tardy because you would have had to jaywalk to get to your work on time. She didn't contact the DEA, is that the agency? Yeah, the DEA contacted her. So she didn't blow the whistle. They contacted her, asked her a question about reporting requirements or recordkeeping, and she basically said, I don't know. To some extent, she said yes. She didn't blow the whistle. She said, I just don't have knowledge. That's correct. Is that right? That's correct. She referred them to the other building? You know, I can't recall what she did there, but all I know is that she did not tell Mercy. They had some issues about actually what she did is she referred it to the supervisor, and she told the supervisor to call the DEA because the DEA had some questions about our recordkeeping. So does that relate to the whole inventory thing, right, or not?  It's reporting of the protected drugs, isn't it? I think so, and I think it was also the transportation of opiates, too. There has to be some recording if we transfer opiates between the hospitals, et cetera. And what was the timing between that conversation and the discovery of the inventory problem? The timing, that's her only issue there is the temporal proximity. The timing was within a week or two, she ended up getting terminated, and that's what she's saying is it was because of this conversation with the DEA that she's saying that that's where the whistleblower comes in. And Ohio law is pretty clear that temporal proximity alone isn't enough to get you to a... So what prompted the inventory issue? How did that... In regard to the DEA? No, you're saying the DEA thing was completely unrelated to that... Yes. To the inventory? Yeah. I'm asking you what prompted the discovery that the inventory was low? That led to calling her, et cetera, et cetera. That was a pharmacist who had an order for certain drugs and had to fulfill the order and notice that the pharmacy inventory was either out or low. That's what prompted that. The DEA was... I guess there were certain regulations about the transportation of opiates that had changed. There was more paperwork, and the DEA was calling us to remind us that the regulations had changed and you had to do more paperwork. That really isn't her responsibility as somebody who's the buyer or the supplier of the drugs, is it, the reporting requirements? The DEA, I would assume, would be somebody else. That's correct. Okay, so I just want to understand. So somebody was looking for a drug. It wasn't in stock. The pharmacist. The pharmacist, that's right. Okay, and then that pharmacist called somebody? That's right. That pharmacist tried to get a hold of Hale, who was in charge of that, couldn't find Hale, then called Hale's supervisor and said, where's Hale? She's supposed to be here because she split her time between the two hospitals. And that day she was supposed to be there. They couldn't find her anywhere. Couldn't find her anywhere. So now they're raising a question. That's what led to the audit of the time and then the whole thing unraveled. Thank you. Any further questions? All right. We've got three minutes rebuttal. Thank you, Your Honor. How old is or how old was your client when this happened? I believe she was 44 at the time. 44, okay. I'm just going to go through these quickly. Mr. Winsak says that Ms. Hale had a full opportunity in this internal appeal. The evidence is undisputed that they never gave her the audit that's the subject of all this claim for purposes of the internal appeal. They refused to give it to her. They said it was proprietary and we don't have to give it to you. That's not a neutral, fair opportunity in the appeal. Did she eventually get it, though? Yes, Judge. When she filed her claim for unemployment benefits, she subpoenaed it, and it was finally turned over, and with that audit and with her calendar, she was able to demonstrate to the Unemployment Review Commission that she had legitimate reasons for these absences. Okay, but how about during her deposition in this case? Judge, I think Mr. Winsak and I will just have to disagree about that. In her deposition, she explained Mr. Winsak asked her, on this date on your calendar you don't have anything about working an extra hour. And she said, no, I don't. But I know that at this point in time I was at a meeting at Fairfield. This helps me remember that I was at a meeting at Fairfield Hospital, or it helps me remember that I spent an hour or two on some new program that was coming up. There were really only three or four dates in question where she added time. The majority of these edits, and what they're calling alterations, are when she would simply plug in her time, as I said in the brief, as she testified. She kept track of her time manually. When she would come in, she would write down when she came in. When she left, she would write down when she left. She would then, all at the same time for each week, enter all that time manually into the computer. Each time she did that, Mercy calls that an alteration. She's just adding her time, documenting her start and leave time. Other people did that too. So what they're calling these huge amount of alterations are largely explained by the fact that that's how she entered her time generally. There are three or four dates in question where she added an hour's time, and she fully explained why she did it. There are also that she entered her time and she never took a lunch break. I mean, she always credited herself for the lunch, so she never ate lunch. I'm sorry, Your Honor. Ms. Hale didn't eat lunch often. She had gastric bypass surgery. I guess she never ate lunch according to her entries, right? She documented it properly according to the policies, and we've cited that in our brief about how to do that. Mr. Wright, a comparator, was not fired. By the time they discovered this, he had left the hospital, so they took no adverse action against him. The other people who they caught doing this through the audit were told to stop. That's it. Much more, when they found out that she made a perspective clock out, lied from our perspective. She was questioned about it. Bill Carroll just went to her and talked to her. There was no discussion with the CEO. There was no threat of termination. He went and talked to her, and when he talked to her, the evidence is that she probably lied to him. She made up a story about a day that she wasn't even at work. No discipline for much more. Well, how are they supposed to know that she lied? They have all the records that we have. She was talking about something that happened on, I believe the date is April 29th, and on April 29th, her records show that she wasn't even at work. She was off that day. So why do you think they did this? Did Pam hail? Yeah. Just there's evidence that it's because of her age and because of this. Any history of age discrimination against 44-year-old people? Judge, the Reeves case, which is the United States Supreme Court, says that if you can establish a prima facie case and pretext, that's sufficient to win an age determination. To answer my question, there is no evidence at all of a pattern of age discrimination, of comments. I mean, normally in a case, even if it's not sufficient direct evidence, there's some statements or comments or this or that to say, well, I can't really prove I've got to do a circumstantial case because my direct evidence is real shaky, but I've got something here. I mean, do you have anything here that this employer is likely to discriminate based upon somebody's 44-year-old age, which to me seems rather young? I understand that. But we do have, Judge, we have a prima facie case. We have Abigail Muchmore, who was 30 years old, the pharmacy buyer at Claremont, where the inventory shortage occurred. Okay, can you speak? I'm sorry. You're saying that the inventory shortage, this doctor was trying to get this medicine not from where? Was Ms. Hale working? Ms. Hale was working four days a week at Anderson and one day a week at Claremont. Okay. At that time. So this shortage was at Claremont, not Anderson. Correct. And her job, she had the same job at both places? She was asked to come over one day a week to help Ms. Muchmore. So it was really Ms. Muchmore's job? From our perspective, it was, Judge. She was the buyer, inventory buyer for Claremont. But did the doctor try to call her? Not that we know of. There's no evidence. Okay, so do you disagree that this was all started when the doctor tried to find her? Yes. It was a pharmacist who allegedly tried to find Ms. Hale. This is all coming secondhand through Gail Heinzelman. And, Judge, we pointed out in the record there are four different stories about why this audit started. Ms. Gaynor, who's the HR person, said that it was a random audit. Ms. Gaynor, who's the HR person, also said that it didn't start until 4.59 on the afternoon of June 10th. Ms. Gaynor, who's also the HR person, says at a different point that the audit started a couple weeks ago. There is no valid, legitimate, consistent explanation for why this audit. How about the pharmacist? Was the pharmacist consistent that I couldn't find the drugs and, therefore, I wanted to find Ms. Hale? Was there any dispute there? We didn't depose him. But there are four different stories. Does he have an affidavit? Ed didn't submit anything from him. Okay, well, how do we get his? Everybody refers to the pharmacist. Where does that come from, then? Not everybody refers to the pharmacist. Gail Heintzelman, one person, claimed that this all happened because a pharmacist called her and said that there was a shortage and she couldn't locate Ms. Hale or her boss. It comes from her testimony. It comes from Heintzelman's testimony. But, again, Judge, there's also testimony from another HR person that says this all started because Bill Carroll, Ms. Hale's manager, had concerns about her stealing time. Completely unsupported. There's four different stories in the record from Mercy's witnesses. Okay, did Carroll testify? He testified. He had no problem with Ms. Hale's timekeeping. Okay. Any further questions? I'm Judge Simon. Judge White. All right, thank you, counsel. The case will be submitted.